IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JOHNNY PAUL DOUGHERTY,
        Plaintiff,                No. 2:11-CV-947 GGH (TEMP)
    vs.

MICHAEL J. ASTRUE,             ORDER
Commissioner of
Social Security,

        Defendant.
_____/

        Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI, respectively, of the Social Security Act ("Act"). For the reasons that follow, plaintiff's motion for summary judgment is granted in part, defendant's cross-motion for summary judgment is denied, the case is remanded for further proceedings under sentence four of 42 U.S.C. § 405(g), and judgment is entered for plaintiff.

BACKGROUND

        Plaintiff, born August 31, 1965, applied on July 25, 2008 for DIB and SSI alleging that he became disabled on July 1, 2007. (Tr. at 16, 30, 110, 117.) Plaintiff contended that he was unable to work primarily due to back pain, knee pain and numbness, right leg pain and

1  numbness, high blood pressure, and depression. (Tr. at 135, 181-82, 191.)  These claims were

2  denied initially on August 26, 2008 and upon reconsideration on November 5, 2008. (Tr. at 16,

3  46-49.)  Thereafter, on November 12, 2008, plaintiff filed a request for hearing before an

4  administrative law judge ("ALJ"), which was conducted on November 17, 2009 in Stockton,

5  California.  (Tr. at 16, 27, 71-82.)

6         Subsequently, in a decision dated January 25, 2010, ALJ Sandra K. Rogers

7  determined that plaintiff was not disabled. (Tr. at 23.)  The ALJ made the following findings:[1]

    1.    The claimant meets the insured status requirements of the
         Social Security Act through June 1, 2008.

---

[1] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program. 42 U.S.C. § 401 et seq.  Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. § 1382 et seq. Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A parallel five-step sequential evaluation governs eligibility for benefits under both programs. See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-42, 107 S. Ct. 2287 (1987).  The following summarizes the sequential evaluation:
    Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
    Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
    Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
    Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.
    Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.
Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).
    The claimant bears the burden of proof in the first four steps of the sequential evaluation process. Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. Id.

| | | |
|---|---|---|
| | 2. | The claimant has not engaged in substantial gainful activity since July 1, 2007, the alleged onset date (20 CFR § 404.1571 *et seq.*, and 416.971 *et seq.*). |
| | 3. | The claimant has the following severe impairments: degenerative disc/joint disease, obesity and umbilical hernia (20 CFR 404.1520(c) and 416.920(c)). |
| | 4. | The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). |
| | 5. | After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can occasionally climb, balance, stoop, kneel, crouch and crawl. |
| | 6. | The claimant is capable of performing past relevant work as a cashier and lubrication servicer. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965). |
| | 7. | The claimant has not been under a disability, as defined in the Social Security Act, from July 1, 2007 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)). |

(Tr. at 18-23.)

ISSUES PRESENTED

Plaintiff's motion presents the following issues for review: (1) whether the ALJ erred in finding that plaintiff could perform his past relevant work as a lubrication servicer and in classifying his past work as a "cashier"; (2) whether the ALJ improperly rejected the opinion of plaintiff's treating physician; and (3) whether the ALJ failed to meaningfully analyze plaintiff's obesity and its effect on his functioning in violation of SSR 02-1p. The order of plaintiff's issues does not logically comport with the typical five-step sequential evaluation process utilized in social security benefits determinations. Because the second and third issues raised by plaintiff

relate to the ALJ's evaluation of the medical evidence in determining plaintiff's residual functional capacity, the court addresses these issues first and ultimately finds them dispositive.

LEGAL STANDARDS

The court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record as a whole supports it. Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999). Substantial evidence is more than a mere scintilla, but less than a preponderance. Connett v. Barnhart, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted). It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007), quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted). "The court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

ANALYSIS

Plaintiff contends that the ALJ failed to provide specific and legitimate reasons for not crediting the opinion of plaintiff's treating physician and failed to explain why she was not crediting plaintiff's functional capacity assessment performed by a physical therapist at his treating physician's direction.

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals. Holohan v. Massanari, 246 F.3d 1195, 1201-02 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).[2]

---

[2] The regulations differentiate between opinions from "acceptable medical sources" and "other sources." See 20 C.F.R. §§ 404.1513(a), (e); 416.913(a), (e). For example, licensed

Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual. Id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).

To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. An ALJ may reject an *uncontradicted* opinion of a treating or examining medical professional only for *"clear and convincing"* reasons. Lester, 81 F.3d at 830-31. In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for *"specific and legitimate"* reasons. Lester, 81 F.3d at 830. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by a supported examining professional's opinion (supported by different independent clinical findings), the ALJ may resolve the conflict. Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)). The regulations require the ALJ to weigh the contradicted treating physician opinion, Edlund, 253 F.3d at 1157,[3] except that the ALJ in any event need not give it any weight if it is conclusory and supported by minimal clinical findings. Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir.1999) (treating physician's conclusory, minimally supported opinion rejected); see also Magallanes, 881 F.2d at 751. The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a

---

psychologists are considered "acceptable medical sources," and social workers are considered "other sources." Id. Medical opinions from "acceptable medical sources" have the same status when assessing weight. See 20 C.F.R. §§ 404.1527(a)(2), (d); 416.927(a)(2), (d). No specific regulations exist for weighing opinions from "other sources." Opinions from "other sources" accordingly are given less weight than opinions from "acceptable medical sources."

[3] The factors include: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; (6) specialization. 20 C.F.R. § 404.1527.

treating or examining professional.  Lester, 81 F.3d at 831.

In this case, since May 2008, plaintiff was regularly seen for complaints of back pain, knee pain, and hypertension at the San Joaquin General Hospital's Family Practice unit, where he was first diagnosed by physician assistant Dennis Langone with hypertension; obesity; degenerative joint disease of the lumbosacral spine, knees, and left elbow; and gastroesophageal reflux disease.[4]  (Tr. at 202-07.)  Laboratory testing done on May 2, 2008 showed that plaintiff had hyperlipidemia.  (Tr. at 204.)  Also, X-rays taken on June 2, 2008 indicated minimal endplate spurring at multiple levels and mild lumbar spondylosis in the lumbar spine, mild femoropatellar compartment narrowing in the left knee, and a normal impression of the right elbow.  (Tr. at 225-27.)  Mr. Langone's notes regarding a June 6, 2008 visit indicate that plaintiff was "very obese" at 140.7 kg (approximately 310 pounds)[5] and that he had "a hard time getting up onto the table and also laying down and getting up."  (Tr. at 204.)

On or about October 20, 2008, Dr. Manisha Shingate became plaintiff's primary health care provider.  (Tr. at 287.)  At that time, Dr. Shingate also noted that plaintiff was obese at 137.9 kg and a BMI of 40.[6]  (Tr. at 287.)  Dr. Shingate diagnosed plaintiff with hypertension,

---

[4] The record also contains treatment notes from a July 2006 visit, which indicated that plaintiff's hypertension was poorly controlled but asymptomatic, and that he was encouraged to quit smoking.  (Tr. at 208.)  Although plaintiff alleges disability as of July 1, 2007, there is no record of further medical treatment until May 2008.

[5] Plaintiff is six feet tall.  Plaintiff's weight varies.  In August of 2008, he weighed 340 pounds.  (Tr. 236).

[6] "The National Institutes of Health (NIH) established medical criteria for the diagnosis of obesity in its Clinical Guidelines on the Identification, Evaluation, and Treatment of Overweight and Obesity in Adults (NIH Publication No. 98-4083, September 1998).  These guidelines classify overweight and obesity in adults according to Body Mass Index (BMI).  BMI is the ratio of an individual's weight in kilograms to the square of his or her height in meters ($kg/m^2$).  For adults, both men and women, the Clinical Guidelines describe a BMI of 25-29.9 as "overweight" and a BMI of 30.0 or above as "obesity."  The Clinical Guidelines recognize three levels of obesity.  Level I includes BMIs of 30.0-34.9.  Level II includes BMIs of 35.0-39.9.

1  hyperlipidemia, and chronic back pain.  (Tr. at 287-88.)  In addition to taking pain medications,
2  plaintiff was instructed to do stretching and use a heat pad.  (Tr. at 288.)  On November 20, 2008,
3  plaintiff returned to the clinic stating that his back pain had been getting worse over the last two
4  months, that he was experiencing sharp, shooting pain radiating to his right knee, and that it hurt
5  when he walked.  (Tr. at 285.)  During the physical examination, plaintiff had a positive straight
6  leg raise test on the right side and his paraspinous muscles on the sacral region were very tender.
7  (Tr. at 285.)  He was noted to have pain on the right side of his back when he walks.  (Tr. at 285.)
8  The attending physician, Dr. Sabi Ahmed, increased plaintiff's medications and recommended an
9  MRI to rule out any disc prolapse.  (Tr. at 285.)  He also stated that plaintiff would need long
10 term pain control with narcotics once the MRI rules out any disc pathology, and advised plaintiff
11 to follow up with Dr. Shingate.  (Tr. at 285-86.)

12         Subsequently, on December 1, 2008, Dr. Shingate examined plaintiff and noted
13 that his blood pressure was improving, but that he reported signs and symptoms of depression.
14 (Tr. at 268-69.)  A December 10, 2008 MRI of the lumbar spine showed mild right L5-S1 facet
15 arthrosis.  (Tr. at 262.)  During a January 23, 2009 visit, Dr. Shingate noted that plaintiff's
16 depression had improved somewhat, that he did not have any other complaints at that time, but
17 that his hypertension was not at goal.  (Tr. at 257-58.)  On April 28, 2009, Dr. Shingate again
18 stated that plaintiff's hypertension was not at goal and that he was obese and may suffer from
19 sleep apnea that increases his blood pressure.  (Tr. at 251-52.)  She also continued the same doses
20 of pain medications related to plaintiff's chronic lower back pain secondary to degenerative joint
21 disease.  (Tr. at 252.)  On June 16, 2009, plaintiff complained of shortness of breath, especially
22 with exertion, as well as intermittent bilateral lower extremity swelling.  (Tr. at 354.)

---

Level III, termed "extreme" obesity and representing the greatest risk for developing obesity-related impairments, includes BMIs greater than or equal to 40."  SSR 02-1p, at *2.

1          Thereafter, on August 3, 2009, although plaintiff reported that he did not have
2  shortness of breath and lower extremity swelling at that time, he complained of chronic back pain
3  and lower extremity pain. (Tr. at 336.) He indicated that he had not been driving, his pain had
4  recently gotten worse secondary to activity, and that he had increased his dose of methadone to
5  two tablets. (Tr. at 336.) Dr. Shingate stated that plaintiff's chronic low back pain was not
6  controlled due to increased activity and that she would increase his methadone dose. (Tr. at 337.)
7  He was cautioned not to drive or operate machinery. (Tr. at 337.) Dr. Shingate also noted that
8  plaintiff's hypertension was not at goal, and that plaintiff's pain was probably causing his blood
9  pressure to get worse. (Tr. at 337.) She refilled his medications, recommended that he follow
10 the Southwestern Diet, and indicated that additional medication may be prescribed after further
11 checks. (Tr. at 337.) Dr. Shingate further reported that plaintiff requested her to fill out
12 disability paperwork. She opined that plaintiff needed a detailed physical therapy evaluation for
13 residual functional capacity for her to fill out the forms and advised plaintiff to obtain the
14 evaluation as soon as possible. (Tr. at 337.)
15          A physical therapy functional assessment was performed on August 17, 2009 by
16 physical therapist Donna Andrews. (Tr. at 330-35.) Plaintiff reported sharp pain in his lower
17 back with left trunk flexion/extension and with rotation. (Tr. at 330.) He experienced pain with
18 lifting 5 pounds and carrying 10 pounds for 30 feet. (Tr. at 331.) The physical therapist noted
19 that plaintiff was capable of climbing one flight of 9 stairs, could balance on his right leg for 10
20 seconds and his left leg for 26 seconds, and was able to squat only once three quarters of the way
21 down. (Tr. at 331.) He was unable to get up from both knees. (Tr. at 331.) The physical
22 therapist further opined that plaintiff could sit for 20 minutes, stand for 15 minutes, and walk for
23 2-3 minutes. (Tr. at 331.) She also noted that he used very poor mechanics for almost all
24 activities and was overweight, quite inflexible in his quads, hamstrings, and low back, and also

1  deconditioned.  (Tr. at 331.)

2  During September and October, 2009, plaintiff continued to experience constant
3  pain increasing with movement as well as elevated blood pressure.  (Tr. at 316-29.)  He received
4  a trigger point injection and was instructed to continue on his pain medication (methadone and
5  oxycodone), but reported that relief from the injection only lasted a few days.  (Tr. at 316, 320-
6  21.)

7  Finally, on October 22, 2009, Dr. Shingate completed a physical residual
8  functional capacity questionnaire for plaintiff.  (Tr. at 369-75.)  She indicated that plaintiff had
9  been a clinic patient since 2006, and had attended monthly office visits.  (Tr. at 370.)  She
10 diagnosed plaintiff with chronic back pain, spondylosis L5-S1, and degenerative joint disease,
11 based on clinical findings of radicular pain, the December 10, 2008 MRI showing mild L5-S1
12 facet arthrosis, the June 2, 2008 back X-ray showing mild lumbar spondylosis, and the physical
13 therapy functional capacity assessment done on August 17, 2009.  (Tr. at 370, 375.)  She further
14 described his symptoms as chronic back pain, pins and needles and stabbing pain in multiple
15 body parts, and severe hypertension.  (Tr. at 370.)  Dr. Shingate opined that plaintiff's depression
16 contributes to the severity of his symptoms and functional limitations, that plaintiff is not a
17 malingerer, that his impairments are reasonably consistent with the symptoms and functional
18 limitations, and that they could be expected to last at least twelve months.  (Tr. at 370-71.)

19 Additionally, Dr. Shingate stated that plaintiff's symptoms would frequently
20 interfere with his attention and concentration, i.e. 34-66% of an 8-hour working day, but
21 indicated that he was capable of low stress jobs.  (Tr. at 371.)  She assessed plaintiff as capable
22 of walking half a block without rest, sitting for 20 minutes at a time, standing for 15 minutes at a
23 time, and sitting/standing/walking for a total of less than 2 hours in an 8-hour working day.  (Tr.
24 at 372.)  According to Dr. Shingate, any job would have to permit shifting positions at will from

sitting, standing, or walking, and plaintiff would need to take unscheduled breaks approximately 3 times an hour for about 15 minutes. (Tr. at 373.) Furthermore, plaintiff could rarely lift 10 pounds or even less than 10 pounds; never lift 20 pounds or more; rarely twist, stoop (bend), crouch, or climb ladders; occasionally climb stairs; grasp, turn, or twist objects with his hands for 10% of an 8-hour working day; perform fine manipulations with his fingers for 30% of an 8-hour working day; and reach with his arms for 5% of an 8-hour working day. (Tr. at 373-74.) Dr. Shingate also indicated that plaintiff would have good and bad days and that he would likely be absent from work more than four days per month. (Tr. at 374.) She assessed the onset date of these limitations as May 2, 2008. (Tr. at 375.)

The only other medical opinions in the record are those of two State Agency physicians, Drs. Dipsia and Harris. (Tr. at 231-37, 243-44.) On August 26, 2008, Dr. Dipsia reviewed plaintiff's medical records and opined that he was capable of light work, i.e. lifting 20 pounds occasionally and 10 pounds frequently; standing, walking, and sitting with normal breaks for about 6 hours in an 8-hour workday; and occasionally climbing, balancing, stooping, kneeling, crouching, and crawling. (Tr. at 232-33.) Subsequently, on November 5, 2008, Dr. Harris reviewed plaintiff's file and affirmed Dr. Dipsia's prior decision. (Tr. at 243.)

The ALJ analyzed the medical opinion evidence as follows:

> As for the opinion evidence, substantial weight is given to the opinion of the State agency medical consultants because they are consistent with the record as a whole and are supported by the medical evidence (Exhibits 2F, 3F, 5F.)...Limited weight is given to the opinion of the claimant's primary care physician, Dr. Manisha Shingate because it is inconsistent with the record as a whole (Exhibit 9F). Dr. Shingate opined that the claimant is capable of low stress jobs but that he could walk for less than half a mile, could sit for 20 minutes at a time, stand for 15 minutes at a time and requires a job that permits shifting positions at will from sitting, standing or walking and must take unscheduled breaks 3 times and [sic] hour during an 8-hour workday (Exhibit 9F/3-5). Dr. Shingate's opinion is not supported by the imaging results

> which show only mild degenerative joint changes (Exhibit 1F, 7F). Moreover, even though Dr. Shingate opined that the claimant's depression would affect the claimant's physical condition (Exhibit 9F/3), as discussed above, the claimant testified that his current medication helps reduce his depression and he has not sought or been referred to psychiatric treatment for his mental condition.

(Tr. at 22.)

As an initial matter, although the limitations assessed by Dr. Shingate may appear unduly severe given the relatively mild imaging results, the court cannot say based on the record before it that Dr. Shingate's opinion is entirely conclusory or unsupported. As outlined above, Dr. Shingate regularly treated plaintiff for a substantial amount of time, and her opinion appears to be based on plaintiff's undisputed diagnoses, her clinical findings, and the physical therapy evaluation she requested. Moreover, as discussed below, even if Dr. Shingate's opinion were deficient, the ALJ's evaluation of the medical opinion evidence is not supported by substantial evidence for several reasons.

First, in determining plaintiff's residual functional capacity, the ALJ relied solely on, and adopted, the opinions of the State Agency physicians who did not make any independent clinical findings. "When an examining physician relies on the same clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions of the examining physician are not "substantial evidence." Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007). Here, the State Agency physicians were not even examining physicians, but non-examining physicians who did not offer any different diagnoses or make any different clinical findings. They never had an opportunity to physically observe and assess plaintiff. The opinion of a non-examining

\\\\\
\\\\\
\\\\\

professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional.  Lester, 81 F.3d at 831.[7]

Second, the opinions of the State Agency physicians, rendered on August 26 and November 5, 2008, are not the most recent medical opinions in the record and did not take into account the post-November 5, 2008 medical evidence.  As outlined above, the record suggests that plaintiff's symptoms may have worsened in 2009 and that his medication dosage was increased.  Furthermore, the State Agency physicians did not have access to the results of the subsequent physical therapy evaluation performed on August 17, 2009.

Third, although the ALJ made reference to the physical therapy evaluation, she entirely failed to explain why she did not credit its findings.  Generally, when assessing residual functional capacity ("RFC"), the ALJ is required to "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."  SSR 96-8p, at *7.  Physical therapists are not "acceptable medical sources" who can provide evidence to establish a medically determinable impairment.  20 C.F.R. § 404.1513(a).  However, they do qualify as "other sources" under 20 C.F.R. § 404.1513(d), and their opinions as to functional limitations resulting from an established impairment must be evaluated and can only be discounted by providing specific reasons, germane to the witness.  SSR 06-03p, at ** 3, 5; Stout v. Commissioner of Social Security, 454 F.3d 1050, 1053 (9th Cir. 2006).  Here, the ALJ's failure to analyze the physical therapy evaluation was not harmless, because it contradicts the ALJ's RFC assessment and supports Dr. Shingate's opinion.  Therefore, the court cannot conclude that "no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination."  Stout, 454 F.3d at 1056; see also Talley v. Astrue, 400 Fed. App'x 167, 169 (9th

---

[7] For unknown reasons, the Commissioner canceled plaintiff's scheduled clinical evaluation with a consultative examiner.  (Tr. at 237.)

Cir. 2010).

Finally, the ALJ failed to provide specific and legitimate reasons for not crediting Dr. Shingate's opinion. As discussed above, the ALJ's primary reason for giving limited weight to Dr. Shingate's opinion was that it was not supported by the imaging results which showed only mild degenerative joint changes.[8] At an initial glance, this appears to be a legitimate reason to discount the treating physician's opinion. Here, however, and related to the third issue raised by plaintiff, that reason fails to take into account the impact of plaintiff's extreme obesity on his functioning when considered in combination with his other impairments.

SSR 02-1p provides as follows:

> Obesity can cause limitation of function. The functions likely to be limited depend on many factors, including where the excess weight is carried. An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching. The ability to manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers. The ability to tolerate extreme heat, humidity, or hazards may also be affected.
>
> The effects of obesity may not be obvious. For example, some people with obesity also have sleep apnea. This can lead to drowsiness and lack of mental clarity during the day. Obesity may also affect an individual's social functioning.
>
> An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. Individuals with obesity may have problems with the ability to sustain a function over time...In cases involving obesity, fatigue may affect the

---

[8] The other reason was that, even though Dr. Shingate opined that plaintiff's depression would affect his physical condition, plaintiff testified that his current medication helps reduce his depression, and he has not sought or been referred to psychiatric treatment for his mental condition. The court agrees that plaintiff's depression does not seem to be a severe impairment. Nevertheless, this is not a sufficient reason for rejecting Dr. Shingate's opinion, which relates almost entirely to plaintiff's *physical* condition and limitations.

> individual's physical and mental ability to sustain work activity. This may be particularly true in cases involving sleep apnea.
>
> *The combined effects of obesity with other impairments may be greater than might be expected without obesity.  For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone*...As with any other impairment, we will explain how we reached our conclusions on whether obesity caused any physical or mental limitations...When we identify obesity as a medically determinable impairment...we will consider any functional limitations resulting from the obesity in the RFC assessment, in addition to any limitations resulting from any other physical or mental impairments that we identify.

SSR 02-1p, at **6-7 (emphasis added).

In this case, the ALJ specifically assessed plaintiff's obesity as a severe impairment at step two (tr. at 18) and indicated that plaintiff suffered from "extreme obesity." (Tr. at 21.)  Indeed, the medical records reveal that plaintiff almost consistently had a BMI of 40 or more, weighing around 300-340 pounds.  The ALJ also acknowledged that the physical therapist attributed plaintiff's inflexibility with his range of motion to his being overweight and that he had trouble getting onto a table, lying down, and getting up.  (Tr. at 21.)  Additionally, plaintiff displayed various other classic symptoms of obesity, such as hypertension, hyperlipidemia, potential sleep apnea, etc.

Nevertheless, the ALJ failed to meaningfully analyze and consider any functional limitations resulting from plaintiff's obesity in her RFC assessment.  Similarly, although State Agency physician Dr. Dipsia performed an itemized analysis of plaintiff's other impairments, he did not analyze the impact of plaintiff's obesity.  (Tr. at 237.)   Because the combined effects of plaintiff's obesity and his other impairments may be greater than expected without obesity, the ALJ erred in discrediting Dr. Shingate's opinion solely on the basis of the relatively mild imaging results.  Even though Dr. Shingate herself did not specify exactly to what extent

plaintiff's obesity may have increased his functional limitations resulting from other impairments, the ALJ, clearly being aware of plaintiff's extreme obesity, had a duty to further develop the record in this regard by requesting clarification from Dr. Shingate or obtaining a consultative evaluation.  See Celaya v. Halter, 332 F.3d 1177, 1183 (9th Cir. 2003).

The ALJ also suggested that plaintiff was non-compliant with dieting and therefore failed to follow prescribed treatment.  However, the court finds that the record is not sufficiently developed to make such a finding.  SSR 02-1p states as follows:

> Obesity is a disease that requires treatment, although in most people the effect of treatment is limited...People with extreme obesity, even with treatment, will generally continue to have obesity.  Despite short-term progress, most treatments for obesity do not have a high success rate....
>
> Before failure to follow prescribed treatment for obesity can become an issue in a case, we must first find that the individual is disabled because of obesity or a combination of obesity and another impairment(s).  Our regulations at 20 CFR 404.1530 and 416.930 provide that, in order to get benefits, an individual must follow treatment prescribed by his or her physician if the treatment can restore the ability to work, unless the individual has an acceptable reason for failing to follow the prescribed treatment.  We will rarely use "failure to follow prescribed treatment" for obesity to deny or cease benefits....
>
> The treatment must be prescribed by a treating source..., not simply recommended.  A treating source's statement that an individual "should" lose weight or has "been advised" to get more exercise is not prescribed treatment.
>
> When a treating source has prescribed treatment for obesity, the treatment must clearly be expected to improve the impairment to the extent the person will not be disabled...Therefore, we will not find failure to follow prescribed treatment unless there is clear evidence that treatment would be successful.  The obesity must be expected to improve to the point at which the individual would not meet our definition of disability, considering not only the obesity, but any other impairment(s).

SSR 02-1p, at **8-9.

1           Here, plaintiff had not been found disabled at the time in question, and therefore,
2 as an initial matter, SSR 02-1p precludes the ALJ from considering the effect of any failure to
3 follow treatment for obesity.  SSR 02-1p, at *9; see also Orn, 495 F.3d at 637.  Additionally,
4 there is insufficient evidence in the record that plaintiff was "prescribed treatment" for weight
5 loss as that term of art is used in the Social Security context.  Orn, 495 F.3d at 637.  While he
6 was advised several times to lower his salt intake, lose weight, follow a Southwestern diet, make
7 lifestyle changes, exercise, obtain a dietary consult, etc. (see e.g. tr. at 202, 252, 288, 337), these
8 general recommendations do not amount to "prescribed treatment."  Id.; see also SSR 02-1p, at
9 *9.  Even if these could be construed as "prescribed treatment," there is no clear evidence in the
10 record that the treatment would have been successful.  Orn, 495 F.3d at 637.
11           In sum, the ALJ erred in her evaluation of the medical evidence, and her
12 assessment of plaintiff's residual functional capacity is not supported by substantial evidence.
13 Therefore, the court finds that remand is necessary for a medical consultation by a consultative
14 examiner, who is provided full access to plaintiff's prior medical records, to evaluate the
15 combined effect of plaintiff's obesity along with his other impairments.  Additionally, the ALJ
16 may obtain further clarification from plaintiff's treating physician if needed.  After reevaluation
17 of plaintiff's residual functional capacity, the ALJ may also deem it appropriate to conduct a
18 supplemental hearing with vocational expert testimony regarding any limitations found, if
19 necessary.
20           Finally, because the court concludes that further assessment of plaintiff's residual
21 functional capacity is necessary, the court declines to reach plaintiff's first and remaining issue
22 concerning alleged errors at step four of the sequential evaluation process.
23 \\\\\
24 \\\\\

CONCLUSION

Accordingly, for the reasons outlined above, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for summary judgment (dkt. no. 17) is granted in part;

2. Defendant's cross-motion for summary judgment (dkt. no. 19) is denied;

3. The case is remanded for further proceedings consistent with this opinion pursuant to sentence four of 42 U.S.C. § 405(g);

4. Judgment is entered for plaintiff; and

5. The Clerk of Court is directed to close this case.

DATED: February 28, 2012

          /s/ Gregory G. Hollows
UNITED STATES MAGISTRATE JUDGE

GGH/wvr
Dougherty.947.ss.wpd